J-A20008-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SAID GRANT | : | |
| | : | |
| Appellant | : | No. 1151 EDA 2023 |

Appeal from the Judgment of Sentence Entered May 3, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0007915-2021

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SAID GRANT | : | |
| | : | |
| Appellant | : | No. 1152 EDA 2023 |

Appeal from the Judgment of Sentence Entered May 3, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0009357-2021

BEFORE:  LAZARUS, P.J., PANELLA, P.J.E., and DUBOW, J.

MEMORANDUM BY LAZARUS, P.J.:                    **FILED JANUARY 30, 2025**

Said Grant appeals from the judgments of sentence,[1] entered in the

Court of Common Pleas of Philadelphia, following his convictions at CP-51-CR-

_____

[1] Grant filed separate notices of appeal in accordance with the dictates of
***Commonwealth v. Walker***, 185 A.3d 969 (Pa. 2018) and Pa.R.A.P. 341.  On
May 16, 2023, this Court *sua sponte* consolidated Grant's appeals.  ***See***
Pa.R.A.P. 513.

0007915-2021 (No. 7915-2021) to one count each of criminal attempt—homicide,[2] aggravated assault,[3] person not to possess firearm,[4] conspiracy—criminal homicide,[5] firearms not to be carried without a license,[6] carrying firearms on public streets of Philadelphia,[7] simple assault,[8] and recklessly endangering another person (REAP);[9] and at CP-51-CR-0009357-2021 (No. 9357-2021) to one count each of person not to possess firearm,  firearms not to be carried without a license, and carrying firearms on public streets of Philadelphia.  After careful review, we affirm in part and reverse in part, vacate Grant's judgments of sentence at both dockets, and remand, with instructions, for a new trial.

On April 29, 2021, at 2:56 p.m., Philadelphia police officers responded to a shooting at 4624 Woodland Avenue in Philadelphia.  The officers did not apprehend any of the shooters but encountered Mohamed Conde and Salu

---

[2] 18 Pa.C.S.A. § 901(a).

[3] *Id.* at § 2702(a)(1).

[4] *Id.* at § 6105(a)(1).

[5] *Id.* at § 903.

[6] *Id.* at § 6106(a)(1).

[7] *Id.* at § 6108.

[8] *Id.* at § 2701(a).

[9] *Id.* at § 2705.

Diallo, who had both been shot. Conde had been shot in his arm and Diallo had been shot multiple times, including in his leg and arm. Conde and Diallo were transported to Children's Hospital of Philadelphia (CHOP) and Penn Presbyterian Hospital, respectively. Both Conde and Diallo survived the incident.

Detective Timothy Connell was assigned to investigate the shooting and ultimately recovered 25 fired cartridge casings (FCCs) from the crime scene. Additionally, Detective Connell recovered a surveillance video from a convenience store at the corner of Woodland Avenue and May Street. The surveillance video did not capture the shooting, but did show a burgundy Buick LaCrosse arrive at the scene shortly before the shooting. The video also depicted the Buick's partial plate "KJH" surrounded by a black and yellow license plate frame. The video shows three men[10] exit the Buick and travel in the direction of 4624 Woodland Avenue. The Buick remained idling in the middle of the road with its doors open. Shortly thereafter, the men returned to the Buick and the car left the scene. Detectives issued an alert for any vehicle matching the Buick's description.

Approximately three weeks later, on May 18, 2021, two plainclothes officers observed Grant leaving his residence at 5331 Thomas Avenue, and

_____

[10] Grant was not charged or tried with any co-defendants. However, the search warrant in this case indicates that detectives believed these three men to be members of "524," a group that had recently been involved in a "territory dispute" over the 4600 block of Woodland Avenue. *See* Commonwealth Exhibit C-2 (search warrant); *see also* Commonwealth's Brief, at 15.

getting into a burgundy Buick LaCrosse with license plate "KJH0870."[11]  The plainclothes officers radioed for a uniformed officer to stop the vehicle.  Officer Kyle Miller responded and stopped the Buick at 900 South 55th Street, approximately one-and-one-half blocks away from Grant's residence.  Officer Miller immediately arrested Grant and transported him to the 18th District police station for questioning.  The Buick was towed to "a police tow lot."  N.T. Suppression Hearing, 10/25/22, at 31.

Grant was later transported to Philadelphia's Southwest Detectives' Bureau, where he was questioned for approximately 12 hours.  During this time, Grant was advised of his *Miranda*[12] rights and waived them.  Grant gave a recorded statement in which he acknowledged that, on April 29, 2021, he picked up three males, whom he could not identify by name, although he knew two by social media handles, drove them to the area of 4600 Woodland Avenue, waited while they left the car and returned, and then drove them away and dropped them off at another location.  Additionally, Grant told the detectives that he did not know the men intended to shoot anyone, he did not see any guns, and did not have a gun himself.

---

[11] Although Grant was seen entering and operating the Buick on May 18, 2021, the Buick was registered to his mother, Fatima Grant, who had given him permission to use it.  *See* N.T. Suppression Hearing, 10/25/22, at 6, 51-52 (stipulating Fatima authorized Grant to operate Buick).

[12] *Miranda v. Arizona*, 384 U.S. 436 (1966).

After Grant made the above statements, police sought, secured, and executed a search warrant on the Buick and recovered, *inter alia*, a Taurus 9mm handgun. Detectives returned to Grant, who was still in custody, and again advised Grant of his **Miranda** rights, which he waived a second time. Grant then admitted to possessing the handgun the night before but had forgotten that the handgun was in the car. Subsequently, Grant was charged at No. 7915-2021 for the shooting incident and at No. 9357-2021 for the firearm found in the Buick.

On April 7, 2022, Grant filed a motion to suppress, arguing, *inter alia*,[13] that his arrest was unlawful, his **Mirandized** statements were poisoned by his unlawful arrest, the seizure of the Buick was unlawful and not supported by probable cause, and that the subsequent search warrant was tainted by both his unlawful arrest and the unlawful seizure of the Buick. **See** Motion to Suppress, 4/7/22, at 1-2.

On October 25, 2022, the trial court conducted a joint suppression hearing, on both dockets, after which it denied Grant's suppression motion. Grant proceeded directly to a stipulated non-jury trial on both dockets and the trial court convicted him of the above-mentioned offenses. The trial court deferred sentencing and ordered the preparation of a pre-sentence investigation report.

_____

[13] In his motion to suppress, Grant raised several other claims relating to the **Miranda** warnings provided to him by detectives. However, these claims have not been raised on appeal.

On May 3, 2023, the trial court sentenced Grant at both dockets. In particular, at No. 7915-2021, the trial court sentenced Grant to a period of 8 to 16 years' incarceration for his convictions of criminal attempt—homicide, 5 years' probation for his convictions of aggravated assault, and no further penalty for the remaining convictions. At No. 9357-2021, the trial court imposed a sentence of 5 years' probation for Grant's conviction of person not to possess firearm and no further penalty for his remaining convictions. The trial court imposed Grant's criminal attempt—homicide sentences concurrently and imposed his probationary terms consecutive to the criminal attempt—homicide sentences, but concurrently to each other. As a result, Grant was sentenced in the aggregate to 8 to 16 years' incarceration, followed by 5 years' probation. Grant did not file post-sentence motions.

Grant filed a timely notice of appeal and a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Grant now raises the following claims for our review:

> 1. Was the evidence insufficient to support [Grant]'s conviction[s] [at No. 7915-2021], where the Commonwealth failed to establish that [Grant] entered into an agreement or acted with the intent to promote offenses committed by his alleged co-conspirators, that any such agreement encompassed the intent to kill, or that [Grant] acted with the specific intent to kill?
>
> 2. Did the trial court err in denying [Grant]'s motion to suppress two video-recorded statements, where those statements were the product of an unlawful arrest unsupported by probable cause?
>
> 3. Did the trial court err in denying [Grant]'s motion to suppress a firearm recovered from an automobile, where the automobile was seized and towed without probable cause and without a

warrant or exigent circumstances, and where a search warrant obtained following the seizure was unsupported by probable cause and the fruit of prior illegality?

4. Did the trial court err in convicting and sentencing [Grant] for both attempted murder and conspiracy to commit murder?

Brief for Appellant, at 4 (reordered for ease of disposition).

Grant contends that the Commonwealth presented insufficient evidence to sustain his convictions at No. 7915-2021. *See* Brief for Appellant, at 36-45. Specifically, with regard to his conspiracy—criminal homicide conviction, Grant argues that the Commonwealth failed to introduce any evidence that he entered into an agreement with the alleged co-conspirators, or that any such agreement encompassed the intent to kill, or that Grant acted with the intent to kill. *See id.* Further, regarding all of his other offenses, Grant asserts that the Commonwealth presented insufficient evidence to support a finding of accomplice liability. *See id.* Grant posits that without an established conspiracy or accomplice liability, none of his convictions at No. 7915-2021 can stand. *See id.* at 44-45.

We adhere to the following standard of review:

The standard we apply in reviewing the sufficiency of the evidence is whether[,] viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not [re-]weigh the evidence and substitute our judgment for [that of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that[,] as a matter of law[,] no probability of fact may be drawn from the combined circumstances. The

- 7 -

Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated[,] and all evidence actually received must be considered. Finally, the [trier] of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

*Commonwealth v. Smith*, 97 A.3d 782, 790 (Pa. Super. 2014) (citation omitted).

In order to convict a defendant of conspiracy,[14] the Commonwealth must prove that: "(1) the defendant intended to commit or aid in the commission of the criminal act; (2) [] the defendant entered into an agreement with another to engage in the crime; and (3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime." *Commonwealth v. Le*, 208 A.3d 960, 969 (Pa. 2019). Section 903 of the Crimes Code provides:

A person is guilty of conspiracy with another person or persons to commit a crime if[,] with the intent of promoting or facilitating its commission[,] he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

_____

[14] We note that Grant only challenges his conspiracy conviction and his remaining convictions insofar as he was found guilty under a theory of accomplice liability. *See* Brief for Appellant, at 36-45. Consequently, we do not analyze whether there was sufficient evidence for each element of each offense, but rather whether there was sufficient evidence of conspiracy and accomplice liability.

- 8 -

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S.A. § 903(a).

Simplified, conspiracy requires proof of three elements: (1) an agreement, (2) shared criminal intent, and (3) an overt act. *See* *Commonwealth v. Murphy*, 795 A.2d 1025, 1037-38 (Pa. Super. 2002). The "overt act need not be committed by the defendant; it need only be committed by a co-conspirator." *Commonwealth v. Hennigan*, 753 A.2d 245, 253 (Pa. Super. 2000). Our Supreme Court has explained:

At the heart of every conspiracy lies the common understanding or agreement between the actors. Implicit in any conspiracy is proof . . . that an accused agrees to participate in the alleged criminal activity. The criminal union being prosecuted cannot be based upon an agreement to complete a broad undefined objective at some unknown point. Rather, the agreement must rest upon the mutual specific intent to carry out a particular criminal objective. The *sine qua non* of a conspiracy is the shared criminal intent. Without this common purpose, a conspiracy cannot be maintained.

Proving the existence of such an agreement is not always easy and [conspiracy] is rarely proven with direct evidence. An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities. Indeed, a conspiracy may be proven inferentially by showing the relation, conduct, or circumstances of the parties, and the overt acts of alleged co-conspirators are competent as proof that a criminal confederation has in fact been formed.

[However, a] conspiracy cannot be established based only upon mere suspicion and conjecture. Preexisting relationships or mere association of participants, without more, will not suffice to establish a prosecutable criminal conspiracy. Mere association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient to prove that a particular

actor was involved in a criminal conspiracy. . . . The Commonwealth still must demonstrate the formation of an illicit agreement, the attendant specific shared intent to promote or facilitate the object offense, and an overt act. No level of intimacy or history between actors can replace the elements of the offense.

*Commonwealth v. Chambers*, 188 A.3d 400, 410 (Pa. 2018) (citations and quotations omitted).

Finally, a defendant may be held criminally liable for the acts of another as an accomplice. *See Commonwealth v. Petrie*, 419 A.2d 750, 752 (Pa. Super. 1980) (explaining accomplice liability and conspiracy are not identical). The Crimes Code defines accomplice liability, in relevant part, as follows:

**§ 306. Liability for conduct of another; complicity**

**(a) General rule.--**A person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable or both.

**(b) Conduct of another.--**A person is legally accountable for the conduct of another person when:

(1) acting with the kind of culpability that is sufficient for the commissions of the offense, he causes an innocent or irresponsible person to engage in such conduct;

(2) he is made accountable for the conduct of such other person by this title or by the law defining the offense; or

(3) he is an accomplice of such other person in the commission of the offense.

**(c) Accomplice defined.--**A person is an accomplice of another person in the commission of an offense if:

(1) with the intent of promoting or facilitating the commission of the offense, he:

(i) solicits such other person to commit it; or

(ii) aids or agrees or attempts to aid such other person in planning or committing it; or

(2) his conduct is expressly declared by law to establish his complicity.

**(d) Culpability of accomplice.--**When causing a particular result is an element of the offense, an accomplice in the conduct causing such result is an accomplice in the commission of that offense, if he acts with the kind of culpability, if any, with respect to that result that is sufficient for the commission of the offense.

\* \* \*

**(g) Prosecution of accomplice only.--**An accomplice may be convicted on proof of the commission of the offense and his complicity therein, though the person claimed to have committed the offense has not been prosecuted or convicted[.]

18 Pa.C.S.A. §§ 306(a)-(d), (g).

Our Supreme Court has explained:

In order to sustain a conviction on accomplice liability, the Commonwealth must demonstrate that an individual acted with the intent of promoting or facilitating the commission of an offense and agrees, aids, or attempts to aid such other person in either planning or committing that offense. . . . [A] shared criminal intent between the principal and his accomplice may be inferred from a defendant's words or conduct or from the attendant circumstances.

*Le*, 208 A.3d at 969 (citations omitted). Interpreting subsection 306(c)(1), this Court has observed that "promoting" the commission of an offense means "contribut[ing] to [its] progress or growth," while "facilitating" means "mak[ing] the commission of a crime easier" or "mak[ing] it easier for another person to commit a crime." *Commonwealth v. Kimbrough*, 872 A.2d 1244, 1252 (Pa. Super. 2005) (citation omitted).

- 11 -

"Accomplice liability requires **only aid**, **not an agreement**."

***Commonwealth v. Jordan***, 212 A.3d 91, 95 (Pa. Super. 2019) (citation omitted, emphasis added). "Accomplice liability can be established by circumstantial evidence. In meeting its burden, the Commonwealth may rely wholly upon circumstantial evidence." ***Id.*** (citation omitted).

> [A] defendant cannot be an accomplice simply based on evidence that he knew about the crime or was present at the crime scene. There must be some additional evidence that the defendant intended to aid in the commission of the underlying crime, and then did or attempted to do so. With regard to the amount of aid, it need not be substantial so long as it was offered to the principal to assist him in committing or attempting to commit the crime.

***Commonwealth v. Barnes***, 871 A.2d 812, 822 (Pa. Super. 2005) (citation omitted); ***see also Commonwealth v. Davalos***, 779 A.2d 1190, 1194 (Pa. Super. 2001) ("driver of a getaway vehicle can be found guilty as a co-conspirator if it is reasonable to infer that he was aware of the actual perpetrator's intention").

Nevertheless, section 306 of the Crimes Code reflects a narrow approach to accomplice liability, whereby "a person is an accomplice of another in the commission of 'an offense' if, acting with the intent to promote or facilitate the commission of 'the offense,' he solicits the other person to commit it or aids, agrees, or attempts to aid the other person in planning or committing it." ***Commonwealth v. Knox***, 105 A.3d 1194, 1196 (Pa. 2014) (citing 18 Pa.C.S.A. § 306(c)). Under this offense-specific approach, "status as an accomplice relative to some crimes within a larger criminal undertaking or

episode no longer *per se* renders a defendant liable as an accomplice for all other crimes committed[.] . . . Rather, closer, offense-specific analysis of intent and conduct is required." ***Id.*** at 1196-97.

This Court has explained that "[t]he intent for criminal conspiracy is identical to that required for accomplice liability." ***Commonwealth v. Davenport***, 452 A.2d 1058, 1062 (Pa. Super. 1982). "However, a mere finding that an individual was an accomplice of the criminal actor does not automatically establish that the individual was a conspirator with the actor. Accomplice liability and conspiracy are not one and the same crime." ***See Petrie***, 419 A.2d at 752. "Conspiracy requires proof of an additional factor which accomplice liability does not, namely the existence of an agreement." ***Commonwealth v. Graves***, 463 A.2d 467, 469 (Pa. Super. 1983). Thus, the crime of criminal conspiracy and the concept of accomplice liability are distinct.

Instantly, the trial court addressed Grant's sufficiency challenges as follows:

> At trial, Detective James Brady testified that after [Grant] waived his ***Miranda*** rights, [Grant] described the following sequence to police:
>
> > [Grant] picked up three males at the location of Paxon and Warrington. He knew two of the males by Instagram names. [Grant] stated one was 5200Cedar and one was 1XBoom. [Grant] stated he did not know their [] correct names. [Grant] stated they went around the block at least once. 5200Cedar stated that one of the males they observed in front of 4600 Woodland, 5200Cedar made a statement like, ["]it looks like he's on, he's ready.["] [Grant] stated the three males exited his vehicle and then came back and they [all] left the area. [Grant] stated that

- 13 -

> he dropped them off somewhere in the area of 60th Street after this incident.
>
> N.T. [Non-Jury Trial, 10/25/22, at 41]. Picking up the three individuals in his vehicle, driving them to a new location, looping the block as they sought and discussed their targets, and driving them away immediately after the fact all represent [Grant's] aid to the principal[ actors]. Taken together, these facts properly permitted this [c]ourt to infer that [Grant]'s aid was rendered with the specific intent to promote or facilitate each crime charged under [No.] 7915-2021. Indeed, as the principals fired no fewer than 25 shots at the two victims, this [o]pinion will not belabor the sufficiency of the evidence for the criminal homicide attempt, aggravated assault, simple assault, [or] REAP convictions.

Trial Court Opinion, 7/11/23, at 8-10 (footnote omitted).

After careful review, we agree with the trial court's findings and conclusions. Grant knew his passengers were armed, masked, and seeking revenge. *See* Commonwealth Exhibit C-1 (surveillance video depicting men exiting burgundy Buick wielding firearms and wearing hoods and facial coverings); *see also* Commonwealth Exhibit C-5 (Grant's statement to police that he knew passengers were seeking revenge for social media postings). Grant picked up these passengers, one of whom he had known for years, and circled the block several times, before stopping the car in the middle of the street and waiting with his car doors open, while the principal actors ran down the block to shoot Conde and Diallo. *See* Commonwealth Exhibit C-1 (surveillance video depicting men running from burgundy Buick, and Buick remaining running, in middle of street, with car doors open).

In light of these facts and all reasonable inferences to the Commonwealth as verdict winner, the trial court, sitting as fact-finder,

properly concluded that Grant was a co-conspirator in the shootings of Conde and Diallo. *See Davalos*, *supra*; *see also Commonwealth v. Azim*, 459 A.2d 1244, 1246-47 (Pa. Super. 1983) (per curiam) (finding appellant conspired to commit assault and robbery where he drove two passengers to and from crime scene and "sat at the wheel, with the engine running and lights on, and the car doors open," while passengers got out, assaulted victim, and took victim's wallet "in the vicinity of the car"); *Commonwealth v. Rosario-Hernandez*, 666 A.2d 292, 297 (Pa. Super. 1995) (finding defendant acted as accomplice to shooting where he rode to scene with shooter, waited while shooter walked down street and fired shots at two victims, then drove shooter away). Accordingly, we conclude that the Commonwealth presented sufficient evidence to sustain Grant's convictions at No. 7915-2021.[15]

---

[15] With respect to Grant's firearm convictions at No. 7915-2021, we observe that the trial court, in its opinion, concluded that there was insufficient evidence to sustain those convictions under *Knox* because the Commonwealth failed to introduce any evidence indicating whether the three principal actors were licensed to carry firearms. *See* Trial Court Opinion, 7/11/23, at 9-10. Nevertheless, the trial court concluded that under the common law conspirator theory of liability, Grant could still be found guilty, as that theory would impute the principals' possession of firearms to Grant. *See id.* (citing *Lambert*, 795 A.2d at 2016 (relevant factors to prove conspiracy include "(1) an association between alleged conspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime; and (4) in some situations, participation in the object of the conspiracy"); and *Commonwealth v. Chambers*, 188 A.3d 400, 408, 412-15 (Pa. 2018) (Supreme Court explaining differences between accomplice liability and common law theory of conspirator liability; but declining to address whether common law theory of conspirator liability was abolished by adoption of offense-specific accomplice theory of liability in *Knox* and 18 Pa.C.S.A. § 306).

*(Footnote Continued Next Page)*

Next, Grant argues that the police lacked probable cause to arrest him on May 18, 2021. *See* Brief for Appellant, at 11-22. Grant avers that he was in custody by nature of being arrested and transported to the 18th District police station. *See id.* at 12-15. Grant asserts that police had no information about the owner of the Buick, how many people typically had access to the Buick, or who had operated the Buick on April 29, 2021. *See id.* at 20-22. Grant contends, therefore, that the trial court erred in failing to suppress the subsequent *Mirandized* statements where he was arrested without requisite probable cause. *See id.* at 23-27. Grant posits that he is entitled to a new trial at both dockets. *See id.*

The Commonwealth, in its brief, concedes that the trial court erred in denying Grant's motion to suppress. *See* Commonwealth's Brief, at 7-10. In particular, the Commonwealth agrees that the only evidence the police had at

_____

We decline to address the trial court's determination because, in our view, Grant has not properly raised that issue for our review. We emphasize that, regarding his firearms offenses at No. 7915-2021, Grant has not engaged in the offense-specific analysis required by *Knox* and has not specified any elements of the offenses he challenges other than the general challenge to accomplice liability. *See* Brief for Appellant, at 36-45. Moreover, Grant has not attempted to square his argument with *Chambers*. Consequently, we conclude that Grant has waived the potential sufficiency challenge advanced by the trial court and we make no determination as to whether it is meritorious. *See Commonwealth v. Johnson*, 985 A.2d 915, 924 (Pa. 2009) ("where an appellate brief fails to . . . develop the issue in any [] meaningful fashion capable of review, that clam is waived"); *Commonwealth v. Hardy*, 918 A.2d 766, 771 (Pa. Super. 2007) (explaining appellant's briefing requirements and duties to "present arguments that are sufficiently developed for our review. . . . This Court will not act as counsel and will not develop arguments on behalf of an appellant.").

the time of Grant's arrest was that Grant was driving the vehicle on May 18, 2021. *See id.* at 7-8. The Commonwealth acknowledges that, importantly, the police had no description of the getaway driver, and only had information about the Buick's appearance and a partial license plate number. *See id.* at 8-9. The Commonwealth further concedes that Grant's *Mirandized* statements were fruits of an unlawful arrest. *See id.* at 10. We agree.

Our standard of review in addressing a challenge to a denial of a suppression motion is well settled:

> [This Court] is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [this Court] is bound by [those] findings and may reverse only if the court's legal conclusions are erroneous.

*Commonwealth v. Patrick Jones*, 121 A.3d 524, 526 (Pa. Super. 2015) (citation omitted). Moreover, "[i]t is within the suppression court's sole province as fact[-]finder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Baker*, 946 A.2d 691, 693 (Pa. 2008) (citation omitted).

Generally, police are required to have probable cause to effectuate an arrest. *See Commonwealth v. Thompson*, 985 A.2d 928, 931 (Pa. 2009). Probable cause is established when "the facts and circumstances which are within the knowledge of the officer at the time of the arrest, and of which he

- 17 -

has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime." *Commonwealth v. Gloria Rodriguez*, 585 A.2d 988, 990 (Pa. 1991). In answering this question, we require only a "probability, not a prima facie showing, of criminal activity." *Illinois v. Gates*, 462 U.S. 213, 235 (1983) (citation omitted). In determining whether probable cause exists, we apply a totality of the circumstances test. *Commonwealth v. Gray*, 503 A.2d 921 (Pa. 1985). Probable cause cannot arise from a mere hunch or conjecture, and "mere suspicion is not a substitute for probable cause." *In the Interest of O.A.*, 717 A.2d 490, 495 (Pa. 1998). Additionally, mere presence at or association with a location where criminal activity is occurring does not provide probable cause for a search or arrest. *See Commonwealth v. Joanne Rodriguez*, 614 A.2d 1378, 1384 (Pa. 1992).

This Court has found probable cause to arrest exists when a suspect is found in a vehicle, matching the description of a getaway car, shortly after a crime had been committed. *See Commonwealth v. Ralph Jones*, 335 A.2d 789, 791 (Pa. Super. 1975) (where robbery committed by two black men in distinctive vehicle, officers had probable cause to arrest two black men located in vehicle matching distinctive description located six blocks away one hour after robbery); *Commonwealth v. Rutigliano*, 456 A.2d 654, 657 (Pa. Super. 1983) (description of distinctive getaway vehicle with two male occupants supported probable cause to arrest where distinctive vehicle was located with two male occupants mere hours after crime occurred).

Further, *Miranda* warnings are required where a suspect is both taken into custody and subjected to interrogation. *See Commonwealth v. Yandamuri*, 159 A.3d 503, 520 (Pa. 2017). In determining whether a suspect is in custody, two discrete inquiries are essential: (1) an examination of the circumstances surrounding the interrogation; and (2) a determination of whether, given those circumstances, a reasonable person would have felt that he or she was at liberty to terminate the interrogation and leave. *See id.* (citation omitted). A person is in custody for *Miranda* purposes only when he is physically denied his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation. *See id.*

Instantly, the trial court addressed Grant's arrest claim as follows:

Probable cause existed here to justify [Grant]'s arrest. [The Superior Court's] decision in [] [*Ralph*] *Jones* . . . is instructive. There, the court held that information relayed over police radio, providing details of a specific vehicle leaving the scene of a crime, was sufficient to justify the later, warrantless arrest of its occupants by different officers. It explained:

[T]he arresting officers had been informed by police radio broadcast that a [robbery] had taken place, that a red automobile with a black top and with a license number 86G662 or 86G226 had left the scene, and that two black males had been involved in the crime. About an hour later, six blocks from the bar, the arresting officers spotted an automobile matching this description occupied by two black males. At least the first three digits of the license plate were the same as those for the getaway car. We find these facts sufficient to warrant a person of reasonable caution to believe that the persons in this vehicle had committed a crime, and the arrest was, therefore, constitutionally proper.

- 19 -

Although 19 days had elapsed between the initial report and [Grant]'s arrest here, as opposed to only an hour in [**Ralph**] **Jones**, this delay did not negate the initial finding of probable cause. . . .

On balance, these considerations militate against any finding of staleness. Though the shooting was not an ongoing course of criminal conduct, information of which more fluidly resists staleness, neither were the nature and evidence of the shooting transitory in the way that other crimes often are, for example, those involving drugs. Whereas drugs may be easily and entirely disposed of—thereby requiring especially fresh information to support probable cause—forensic evidence form a shooting-involved vehicle . . . would be significantly harder to locate and dispose of. Three[ ]weeks was not so long that any forensic recovery efforts would be unreasonable. Nor was it so long that the [Buick's] owner may have fairly, say, sold the vehicle to another, thereby risking the arrest of an unwitting driver. At bottom, there remained a "fair probability" that [Grant] . . . committed a felony.

Trial Court Opinion, 7/11/23, at 5-6 (citations omitted).

After careful review, we agree with both Grant and the Commonwealth that the trial court erred in denying Grant's motion to suppress his *Mirandized* statements as fruit of the poisonous tree from his unlawful arrest. As saliently noted by both parties, at the time of Grant's arrest the police had only two facts: (1) a description and partial plate number of the Buick from April 29, 2021, and (2) that Grant was seen getting into the Buick on May 18, 2021. Grant's arrest is easily distinguished from the facts of *Ralph Jones* and *Rutigliano*, where Grant's arrest occurred **19 days** after the crime, not mere hours, and police had **no description of the getaway driver**. *Cf. Ralph Jones*, *supra*; *Rutigliano*, *supra*. Police arrested Grant because they believed he was the April 29, 2021, getaway driver, but other than Grant's

operation of the Buick at the time of his arrest, the police had no articulable facts to support that conclusion. Indeed, as we emphasized, the video did not depict the getaway driver, and the police had no witness descriptions or other evidence of who the getaway driver could be. Thus, absent any other information, the police lacked probable cause to arrest Grant. **See Interest of O.A.**, **supra**. Consequently, we conclude that the trial court erred as a matter of law in denying Grant's motion to suppress on this basis. **See Patrick Jones**, **supra**.

Furthermore, Grant's unlawful arrest poisoned the **Mirandized** statements that he provided. **See Wong Sun v. United States**, 371 U.S. 471 (1963) (where police detained and arrested individual without requisite probable cause, detention and arrest were illegal and all statements and evidence collected as result of illegality required suppression as fruit of poisonous tree). Indeed, Grant's arrest was illegal, which thus poisoned the first set of **Mirandized** statements he provided to police. In turn, those statements, after which police secured a search warrant for the vehicle, poisoned the second set of statements that Grant provided to police.

Accordingly, with respect to Grant's first suppression claim, we reverse the trial court's denial of suppression, vacate Grant's convictions at both dockets,[16] and remand for a new trial. **See Commonwealth v. Goodis**, 299

_____

[16] We note that the **Mirandized** statements apply to evidence at both dockets. With respect to No. 7915-2021, Grant's statements to police support a

*(Footnote Continued Next Page)*

- 21 -

A.3d 1008, 1020 (Pa. Super. 2023) (reversing order denying suppression, vacating convictions, and remanding for new trial "at which no evidence derived from the search and seizure shall be admitted").

Our review does not end here. In his next issue, Grant raises two sub-issues, which we address separately, challenging: (1) the seizure of the Buick, and (2) the validity of the search warrant acquired to search the Buick. *See* Brief for Appellant, at 27-36. In his first sub-issue, Grant argues that the Commonwealth failed to present any evidence that seizing the Buick, rather than merely "securing" it, was necessary. *See id.* at 27-31. Grant contends that, pursuant to *Commonwealth v. Alexander*, 243 A.3d 177 (Pa. 2020), the Commonwealth is required to secure a warrant prior to seizing a vehicle, unless an exception to the warrant requirement applies. *See* Brief for Appellant, at 28-31. Grant asserts that the Commonwealth did not secure a warrant until after towing the Buick and did not meet the "community care-taking" exception to justify the warrantless tow. *See id.* at 28-29. Grant avers that 75 Pa.C.S.A. § 3352(c)(3) does not authorize the seizure of the vehicle either because it is based in the "community care-taking" functions of the police such as public safety concerns and traffic control concerns. *See id.* at 30-31 (citing *Hennigan*, 753 A.2d at 259). Grant posits that the

_____

conclusion that Grant was driving the Buick on April 29, 2021. Regarding No. 9357-2021, Grant admitted ownership of the firearm found in the backseat of the Buick pursuant to the search warrant. As all of these statements must be suppressed, evidence that had been admitted at both dockets is now inadmissible. Accordingly, we must vacate and remand for a new trial at **both** dockets.

Commonwealth provided no evidentiary basis to support the seizure of the Buick other than testimony describing the vehicle as "parked . . . on the east side of the street." *See* Brief for Appellant, at 30 (quoting N.T. Suppression Hearing, 10/25/22, at 34). We disagree.

Our Supreme Court has recently provided the following guidelines for seizures of vehicles:

> [T]he Fourth Amendment of the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution prohibit unreasonable searches and seizures. Protection of reasonable expectations of privacy is the primary purpose of the prohibition against unreasonable searches and seizures. A search or seizure conducted without a warrant is presumptively unreasonable[,] subject to a few specifically established, well-delineated exceptions. These exceptions include, *inter alia*, exigent circumstances, the plain view exception, searches incident to arrest, consent searches, and automobile searches.

***Commonwealth v. Saunders***, 326 A.3d 888, 896-97 (Pa. 2024) (citations and quotation marks omitted).

Our Supreme Court, in ***Commonwealth v. Holzer***, 389 A.2d 101 (Pa. 1978), explained that exigent circumstances arise where "the need for prompt police action is imperative, either because evidence sought to be preserved is likely to be destroyed or secreted from the investigation, or because the officer must protect himself from danger to his person by checking for concealed weapons." *Id.* at 106. Additionally, exigent circumstances can arise "where the warrantless search or seizure by a police officer does not amount to a significant invasion of a defendant's reasonable expectation of privacy." *Id.* Finally, "one's expectation of privacy with respect to an automobile is

- 23 -

significantly less than that relating to one's home or office[.] . . . [Moreso], where the alleged illegal activity does not invade the interior of the car, the chances are even greater that no expectation of privacy has been infringed." *Id.*

Thus, it is reasonable and constitutional for police to seize and hold a car until a search warrant can be obtained, where: (1) the seizure occurs after the user or owner has been placed into custody; (2) the vehicle is on public property; and (3) there exists probable cause to believe that evidence of the commission of a crime will be obtained from the vehicle. *See id.* 106.

Instantly, police observed Grant enter the Buick, which they had been searching for, and stopped the car. Shortly thereafter, the police arrested Grant, albeit an arrest we have determined was not supported by probable cause,[17] and towed the Buick. Based upon the record before us, the police

_____

[17] Based upon our review, Grant's unlawful arrest does not poison the seizure of the Buick. We emphasize that police had probable cause to seize the Buick based upon the surveillance video and distinctive description obtained from that video. In our view, this probable cause was independent of Grant's operation of the Buick on May 18, 2021.

Furthermore, in *Commonwealth v. Milyak*, 493 A.2d 1346 (Pa. 1985), our Supreme Court explained that, while a defendant's confederates are still at large, police may seize the vehicle as a precaution to prevent those conspirators, friends, or family from removing the vehicle. *See id.* at 1350-51 (Pa. 1985) (citing *Holzer*, 389 A.2d at 106, and explaining that still at-large co-conspirators, family, or friends could move vehicle known to be used in commission of crime). Here, the Buick matched the distinctive description from the surveillance video. Additionally, as discussed *infra*, all three of Grant's co-conspirators were still at-large and police had only potentially identified one of them, Nelson. Consequently, we also conclude that there
*(Footnote Continued Next Page)*

did not enter the Buick or search it prior to acquiring the search warrant. Additionally, as we explain **infra**, police had probable cause to believe that evidence of the April 29, 2021, shooting would be contained within the Buick. Consequently, pursuant to **Holzer**, the police acted properly in towing the vehicle while a search warrant was pending. **See Holzer**, **supra**. In our view, the police's actions did not run afoul of **Alexander** because towing the Buick merely facilitated adherence to the search warrant requirement. **See Alexander**, 243 A.3d at 207-08 (overturning **Commonwealth v. Gary**, 91 A.3d 102 (Pa. 2014), and returning to pre-**Gary** limited automobile exception; requiring police secure search warrant prior to searching vehicles). Furthermore, **Holzer** has remained controlling law in this Commonwealth even when **Gary** temporarily adopted the federal automobile exception.[18] **See Saunders**, **supra** (citing **Holzer** favorably); **see also Commonwealth v. Burton**, 222 A.3d 875, at **6-7 (Pa. Super. 2019) (Table) (concluding police conduct was reasonable pursuant to **Holzer**).[19] Accordingly, Grant is not entitled to relief on this claim.[20]

_____

was a higher risk that the Buick could be moved and lost to police if they had not towed the vehicle.

[18] In light of our conclusion, we decline to address whether the seizure was proper under the community care-taking doctrine.

[19] **See** Pa.R.A.P. 126(a)-(b) (unpublished, non-precedential opinions of this Court filed after May 1, 2019, may be cited for persuasive value).

[20] We note that the trial court denied Grant's claim on different grounds; however, this Court may affirm on any basis. **See** Trial Court Opinion,
*(Footnote Continued Next Page)*

- 25 -

In his next sub-issue, Grant argues that the search warrant was not supported by probable cause, and that the information supporting the warrant was stale. *See* Brief for Appellant, at 31-36. Grant contends that there was no evidence to support that the police would find any additional evidence in the Buick, three weeks after the shooting. *See id.* at 35. Grant posits that there was "no reason to think that the guns themselves were still [in the Buick], or that there was any ongoing criminal conduct involving the car." *Id.* Grant avers that police could not reasonably expect to find bullet holes, shell casings, or blood in the vehicle, because the shooting had occurred away from the vehicle and there had been no return fire or injury to the shooters. *See id.* Grant further argues that any fingerprints or DNA would have little if any evidentiary value, since such evidence could have been left by any number of people over the course of 18 days. *Id.* We disagree.

It is well-established that probable cause must be closely related to the facts and time at which the search warrant is issued. *See Commonwealth v. Janda*, 14 A.3d 147, 158-59 (Pa. Super. 2011). "If, however, it is demonstrated that criminal conduct has[,] in fact[,] continued, then the relevant information, in spite of its vintage, may not be deemed stale." *Commonwealth v. Eazer*, 312 A.2d 398, 399 (Pa. 1973); *but see Commonwealth v. Hagen*, 368 A.2d 318, 322 (Pa. Super. 1976) (concluding

_____

7/11/23, at 6 (denying Grant's claim pursuant to section 3352(c)(3), after concluding his arrest was lawful); *see also Commonwealth v. Clouser*, 998 A.2d 656, 661 n.3 (Pa. Super. 2010) ("It is well-settled that this Court may affirm on any basis.").

information at least one month old, without continuing criminal conduct, was stale); *Eazer*, 312 A.2d at 400 (61-days old information stale absent evidence of continuing criminal activity); *Commonwealth v. Suppa*, 302 A.2d 357, 358-59 (Pa. Super. 1973) (16-days-old information stale when affidavit of probable cause offered unsupported assertions appellant's use of residence was to further criminal activity).

However, elapsed time alone is not dispositive. This Court has explained:

> [a]ge of information supporting a warrant application **is a factor** in determining probable cause. . . . The determination of probable cause is not merely an exercise in counting the days or even months between the facts relied on and the issuance of the warrant. Rather, we must also examine the nature of the crime and the type of evidence [to be seized].

*Commonwealth v. Gomolekoff*, 910 A.2d 710, 713 (Pa. Super. 2006) (citation and quotation marks omitted; emphasis added). *See also Commonwealth v. Klimkowicz*, 479 A.2d 1086, 1089 (Pa. Super. 1986) ("The issuing magistrate must consider the nature and quantity of items to be seized, the time lapse involved, and the ease with which items may be disposed.").

The reviewing court must then determine whether the issuing authority had a substantial basis for concluding probable cause existed. *See Commonwealth v. Sherwood*, 982 A.2d 483, 503 (Pa. 2009). This Court, therefore, "must accord deference to the issuing authority's probable cause determination[] and must view the information offered to establish probable

cause in a common-sense, non-technical manner." ***Commonwealth v. Mendoza,*** 287 A.3d 457, 463 (Pa. Super. 2022) (citations omitted).

To establish probable cause, our Supreme Court provided the following instruction:

> Neither the Fourth Amendment nor Article I, Section 8 of the Pennsylvania Constitution explicitly requires individualized suspicion. Nonetheless, although not an "irreducible" component of reasonableness, the general rule is that probable cause must be predicated upon individualized suspicion, and that searches conducted without such suspicion ordinarily are deemed unreasonable.

***Commonwealth v. Jacoby***, 170 A.3d 1065, 1084 (Pa. 2017). Further, "[t]he architects of our Constitutions rejected general searches, and instead charged police officers with demonstrating specific and articulable facts to establish probable cause that a particular person committed a particular crime[,] and that evidence of that crime would be found in a particular place." ***Id.*** at 1085.

Instantly, the affidavit of probable cause attached to the search warrant states:

> On Thursday[,] April 29, 2021[,] at 2:56 [p.m.,] 18th District police officers responded to a radio call for a report of a person shot at 4624 Woodland Ave[nue]. Upon arrival, they were flagged down at 4624 Woodland Ave[nue] and found a male lying on the sidewalk[,] later identified as Complainant #1(SD). Complainant #1 was transported to Penn Presbyterian [Hospital] by police. Responding police also located Complainant #2 (MC) on the 1300 block of S. Markoe St[reet] and transported him to [CHOP].
>
> Complainant #2 was interviewed inside CHOP and stated [he] and his brother (Complainant #1) [had] come out of the barbershop located at 4624 Woodland Ave[nue] and were waiting for an Uber when several masked individuals began shooting at them from the direction of 47th St[reet] and 46th St[reet], but could not provide

any further information.  Complainant #2 was struck one time in the right arm.

Complainant #1 was interviewed inside [Penn] Presbyterian Hospital Emergency Room, also stating [he] and his brother (Complainant #2) had left the barbershop awaiting a ride.  While waiting, he reported a burgundy Buick La[C]rosse pulled up to the corner "by the pizza shop" and two males dressed in all black exited the vehicle and began shooting at the complainants.  He was initially unaware his brother was also struck by gunfire.  Complainant #1 was shot 4 times in his right leg, once in [his] right shoulder, once in [his] right armpit, and once in [his] right buttock.  Neither complainant could provide a motive and both stated there were no disputes prior to the shooting.

The crime scene was processed and (12) .45 cal[iber] FCCs [and] (13) .9mm FCCs and (1) bullet fragment were recovered from the highway near the intersection of Woodland Ave[nue] and S. May St[reet].  Video was recovered from the Woodland Variety Store at 4600 Woodland Ave[nue].  The video shows a Burgundy Buick La[C]rosse with a sun roof travelling s[outh]b[ound] on May Street at 2:54 p.m. stop half way through the block.  The video shows a PA tag and the first three letters are visible "KJH."  The numbers are not legible.  The license plate holder had a distinct yellow and black trim at the bottom.  Three males exit the vehicle.  Offender #1, who exits from the back seat passenger side, is wearing a light[-]colored surgical mask, black hooded sweatshirt over a black baseball cap with a white emblem or sticker on the top left side of the cap's bill, black Nike brand jogger pants with a white Nike "swoosh" emblem on [the] left thigh area, with [a] white or silver zipper on [the] outside of [the] lower legs, and black "low top" style sneakers with white socks, runs northbound on May [Street] holding a black semiautomatic handgun in his right hand.  The male's sweatshirt appears to have white markings on the shoulder and back of the neck area.  The male appears to be approximately 5'6" to 5'8" in height, medium build.  Offender #2 exits the rear driver side wearing a black hooded sweatshirt, black mask, black sweatpants with unknown white emblem on left thigh area, and white sneakers.  He is carrying a silver or grey semiautomatic handgun in his right hand.  He appears taller and thin, approximately 5'11" to 6'0."  Offender #3 exits the front passenger area and is wearing a black hooded sweatshirt, black mask, black jeans, and black "high top" sneakers.  He is carrying a black semiautomatic handgun with an extended magazine also

in his right hand. This male is also thin build and approximately 6'2" in height. Offenders #1 and [#]2 [disappear off] camera range for approximately 7-8 seconds and Offender #3 remains in partial view[, with h]is arms extended and appears to be firing the handgun. This is the immediate area [from which] the [] (25) FCCs are recovered. All three males run southbound back to the vehicle. There appears to be an unknown operator who does not exit the vehicle. The vehicle backs up, where it confronts traffic on 4600 Woodland Ave[nue] and then continues to travel southbound on May Street out of view.

On Friday, May 14, 2021, Police Officer Richard Edwards #3173, currently assigned to the Criminal Intelligence Unite Southwest Task Force, forwarded Det[ective] Brady #676 of Southwest Det[ectives] the following: On April 16, 2021, a YouTube video titled "Heat" premiered by the artist "1xBoom." "1xBoom" is known to P/O Edwards [as a] member of "524", a loosely based group of males whose geographic territory extends from 52nd to 54th Street[.[21]] The group "524" has most recently been feuding with a [group operating in] the area of 46th and Woodland. This feud has been exacerbated by Social Media taunting that investigators believe ha[s] led to several [h]omicides, [a]ggravated [a]ssaults, and [s]hooting [i]ncidents between the 2 groups.

As the video "Heat" begins, a black male is visible at the :10 second mark wearing a black hooded sweatshirt, light[-]colored surgical mask, and black baseball cap with white emblem on the top. The bill of the hat is not visible at this time. The male has distinct tattoos on the side of his left hand near the "pinkie" knuckle area. It appears to be cursive writing that leads down to a small design at the wrist area. At [the] :38 second mark in the video, this same male is visible. At this angle, the top left side of the male's baseball cap bill is visible and a white emblem is visible. Also visible is the male's black Nike jogger pants with a zipper on the outside of the lower leg area. At 1:38 into the video, this same male is visible. Another view of the male's pants is shown again showing the distinct and unique zipper along the outside of the calf. Also visible is the male's Black low top sneakers. While the male's face is partially covered by the mask, his eyes,

_____

[21] The second half of this sentence is illegible but appears to reference the other portion of "524's" "territory."

eyebrow, and forehead are visible at different times, along with
most notably, the distinct tattoo mentioned earlier. P/O Edwards
has been monitoring the activities of "524" for several years and
is confident the male mentioned in the video is Jahsir Nelson. . .
. There is no photo available in [P]ennDOT [for Nelson]. [P/O]
Edwards has been monitoring the social media accounts of Nelson,
most notably the Instagram account of 5200sir, for several years.
On this account was a photograph of Nelson [depicting] Nelson's
face partially covered, however the tattoo on his left hand is
prominent and matches the exact design on the music video
posted on [April 16, 2021.]

* * *

Criminal Intelligence Unit Southwest Task Force Police Officer
Robert LaManna #2894 observed a 2016 burgundy Buick
La[C]rosse with a PA tag of KJH0870 parked unattended at 55th
[Street] and Thomas [Avenue] . . . . The registered owner is
Fatima Grant 5331 Thomas Ave[nue]. The vehicle also had a
distinct yellow and black license plate holder. On May 18, 2021,
at 7:32 p.m. P/O Lamanna observed [Grant] enter the [Buick] and
begin operating it. [P/O] LaManna radioed for uniform back-up
and the vehicle was stopped at S. 55th St[reet] without incident.
The vehicle . . . [was towed Macalester Avenue and] placed on
Property Receipt #3513741[.] Grant was transported to
Southwest [D]etectives for investigation.

* * *

The affiant respectfully requests a search warrant to search the
2016 burgundy Buick La[C]rosse PA Tag KJH-0870 . . . for any
firearms, ammunition, fingerprints, DNA evidence, proof of
ownership, and any items of evidentiary value.

Commonwealth Exhibit C-2 (Search Warrant and attached Affidavit), at 2-3

(unpaginated) (some capitalization, Grant's first *Mirandized* statement, and

Nelson's personal information omitted).[22]

_____

[22] We note that Nelson's personal information is irrelevant to our analysis and
hence, we have omitted it here. It is sufficient to say that the police had
*(Footnote Continued Next Page)*

Based upon our review of the record, it is clear that police had probable cause to search the Buick, as the car was used to transport the shooters on April 29, 2021. Indeed, the search warrant clearly references the surveillance video depicting an almost identical match including the color, distinctive license plate holder, sunroof, and partial license plate number. *See id.* Thus, for this reason alone the magistrate had a substantial basis for concluding that specific and articulable facts existed to support probable cause to search the Buick. In particular, police had probable cause to believe, based upon clothing, tattoos, and affiliation with the "524" gang, that Nelson was one of the three shooters depicted in the Woodland Avenue shooting. Consequently, we find that Grant's assertion that any DNA and fingerprints would be of little evidentiary value is baseless.

Moreover, we are unpersuaded by Grant's staleness argument. While we noted above that this Court has found search warrants stale after as few as 16 days, this Court has also held that time alone is **not dispositive**. *See Gomolekoff*, *supra*. Rather, a reviewing magistrate, whose determinations we give deference, must ascertain the nature and quality of the items searched. *See Mendoza*, *supra*. Here, it is clear from the search warrant that the police were seeking, at a minimum, DNA and fingerprints that would tie a known gang member, Nelson, to the shooting. *See* Commonwealth Exhibit C-2. Certainly, both DNA and fingerprints could be destroyed or

_____

identified Nelson as a potential actor but were unsuccessful in locating him at that time.

muddled, but such evidence is not "easily disposed of." In light of the foregoing, we conclude that the search warrant demonstrates clear and articulable facts that, at the very least, Nelson's DNA or fingerprints would be found within the Buick. *See Jacoby*, *supra*. Thus, the police, armed with a lawful search warrant, would have discovered the firearm in the vehicle even without Grant's *Mirandized* statements, and, therefore, it would be admissible under the inevitable discovery doctrine.[23] Accordingly, Grant's claim is meritless.[24]

_____

[23] The inevitable discovery doctrine provides "evidence which would have been discovered was sufficiently purged of the original illegality to allow admission of the evidence. Implicit in this doctrine is the fact that the evidence would have been discovered despite the initial illegality." *Commonwealth v. Bailey*, 986 A.2d 860, 862 (Pa. Super. 2009). In other words, evidence is admissible under this doctrine where the Commonwealth demonstrates "by a preponderance of the evidence that the illegally obtained evidence . . . inevitably would have been obtained through lawful means." *Id.*

Here, the police included Grant's unlawfully obtained *Miranda* statements in their search warrant affidavit, which could have invalidated the discovery of the firearm in the Buick. However, because the search warrant affidavit was supported by alternative lawful grounds—the probable cause to search for Nelson's DNA and fingerprints—the discovery of the firearm was ultimately lawful. *See Commonwealth v. Anderson*, 40 A.3d 1245, 1249 (Pa. Super. 2012) (cocaine and drug paraphernalia found in defendant's apartment were admissible under inevitable discovery doctrine, even though portion of search warrant permitting police search for cocaine and drug paraphernalia was invalid, because such evidence would have been discovered during valid search for marijuana).

[24] While our analysis does not differ significantly from the trial court's on this claim, the trial court relied upon Grant's now-inadmissible *Mirandized* statements. Having concluded that those statements should have been suppressed, we affirm on a somewhat different basis than the trial court. *See Clouser*, *supra*.

In his last claim, Grant challenges the legality of his sentence. *See* Brief for Appellant, at 46. Grant argues that he was convicted of four inchoate crimes: two counts of conspiracy to commit murder and two counts of attempted murder. *See id.* Grant asserts that under 18 Pa.C.S.A. § 906, "[a] person may not be convicted of more than one of the inchoate crimes of criminal attempt, criminal solicitation[,] or criminal conspiracy for conduct designed to commit or to culminate in the commission of the same crime." *See* Brief for Appellant, at 46 (citing 18 Pa.C.S.A. § 906). Grant contends that his inchoate crimes of conspiracy and criminal attempt both relate to the same crime of murder and, thus, he could not have been sentenced to both. *See id.*

We note that both the trial court and the Commonwealth agree with Grant's position. *See* Trial Court Opinion, 7/11/23, at 10; Commonwealth's Brief, at 23. Additionally, we would also agree; however, we have already vacated Grant's convictions, sentences, and awarded him new trials. Consequently, Grant's sentencing claim is moot.

In sum, we conclude that the Commonwealth presented sufficient evidence to sustain Grant's convictions at No. 7915-2021 as a co-conspirator and accomplice. Additionally, we affirm the trial court's determinations that the search warrant was untainted and supported by probable cause. However, we reverse the trial court's order denying Grant's motion to suppress his arrest and subsequently poisoned *Miranda* statements, which necessitates that we also vacate his convictions at both dockets, and remand for a new trial at both

dockets.  At the new trial, Grant's *Mirandized* statements shall not be admissible.  *See Goodis*, *supra*.  Finally, we conclude that Grant's sentencing challenge is moot.

Judgments of sentence reversed and vacated.  Case remanded for a new trial with instructions.  Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/30/2025